IN THE MATTER OF: DEAN M. PERKINS, KATHY PERKINS, BILLY RAY PERKINS, TONY RAY PERKINS, MARVIN PERKINS, JR., JOSEPH PERKINS, MARVIN PERKINS, SR. AND MARY PERKINS *v.* ALLEN COUNTY DEPARTMENT OF PUBLIC WELFARE.

[No. 3-474A60. Filed July 29, 1976. Rehearing denied September 20, 1976. Transfer denied December 13, 1976.]

*Hugo E. Martz,* of Fort Wayne, for appellants.

*Philip H. Larmore, Adair, Perry, Beers, McAllister & Mallers,* of Fort Wayne, for appellee.

HOFFMAN, J.—Appellants Marvin Perkins, Sr. and Mary Perkins appeal from that part of an order of the Allen Superior Court, Juvenile Division, which made two of their six children, Marvin, Jr. and Joseph, "wards of the Department of Public Welfare for all purposes including adoption." This proceeding was commenced on July 27, 1973, by the Allen

County Department of Public Welfare (Welfare Department) which filed an amended petition requesting that Marvin, Jr. and Joseph Perkins and the remaining Perkins children be made wards of the Welfare Department for "all purposes including adoption."

Such petition resulted from a long history of involvement of the Welfare Department with the Perkins' family. The record reveals that such history began on April 13, 1966, when the Welfare Department filed a petition to have all the children except Joseph, who was not yet born, declared to be dependent and neglected children. The juvenile court entered such a finding on April 15, 1966, and the children were ordered placed in the Allen County Children's Home (Children's Home) until further order of the court. These children were released to the custody of their parents on June 8, 1966. On June 15, 1967, the juvenile court found that the parents were unable to provide adequate care for the six children, and ordered Marvin, Jr. and two of his siblings placed in the Children's Home. The court further ordered appellant Marvin Perkins, Sr. to pay $35 per week for support of these children. On December 21, 1967, the Welfare Department filed a supplemental petition seeking to have Joseph made a ward. On the following day Joseph and two of his brothers were ordered detained at the Children's Home. On October 4, 1968, Marvin Perkins, Sr. was found to be in contempt of the trial court by reason of his nonpayment of the aforementioned support at a time when he was fully able to do so. However, his commitment to jail was stayed to provide him an opportunity to purge himself of such contempt. On March 14, 1969, the court found all six children to be dependent children as defined by statute and made them temporary wards of the Welfare Department. On August 15, 1969, a bench warrant was issued for Marvin Perkins, Sr. for failure to purge himself of his contempt of court by paying the support ordered by the trial court. Marvin, Sr. was incarcerated and was subsequently released from custody on November 12, 1969. On December 4,

1970, two children other than Joseph and Marvin, Jr. were returned to the Perkins' home, and Marvin, Sr. was ordered to pay $35 per week for support of the remaining four children. On January 29, 1971, the father had paid only $15 in support and on April 2, 1971, it was found by the trial court that the father was unemployed and not paying support.

During this period of time Mrs. Perkins was hospitalized for psychiatric care, and "a good deal of turmoil" existed in the Perkins' home. Further, their small home was maintained in an unclean and disarrayed condition, with "very dilapidated" furniture and "holes in the walls."

In the months immediately preceding the filing of the petition which initiated this action, the conditions in the Perkins' home improved to some degree, and the Perkins became able to adequately care for the two children who remained in the home. However, Mrs. Perkins suffered recurrences of her mental disorder, and Mr. Perkins was unable to work due to an injury. It was the opinion of the Welfare Department caseworker that due to these circumstances the Perkins "can care for two children, but we just don't feel that they will ever be able to care for six children at a time."

As a result of this situation, the Welfare Department filed the petition here at issue and, as stated hereinabove, the trial court granted such petition as to Marvin, Jr. and Joseph, making them "wards of the Department of Public Welfare for all purposes including adoption."

On appeal, the Perkins raise several issues regarding the propriety of this disposition by the trial court. The first such issue which they raise is whether the trial court as a juvenile court had jurisdiction to order the termination of their parental rights. The exact position taken by the appellants in this regard is that because the statute delineating the dispositional alternatives of the juvenile courts contains no express grant of an authority to terminate parental rights, no such authority existed in the trial court.

An Indiana juvenile court clearly has jurisdiction to determine whether a child subject to its jurisdiction is dependent or neglected when a petition is before it alleging such conditions. *See,* IC 1971, 31-5-7-7 (Burns Code Ed.). However, it has no jurisdiction over a petition seeking solely to terminate parental rights. IC 1971, 31-5-7-7, *supra;* IC 1971, 31-3-1-7 (Burns Supp. 1975). The issue thus presented by the case at bar is whether a petition alleging dependency or neglect and seeking wardship for all purposes including adoption authorizes a juvenile court to terminate parental rights as a dispositional alternative.

IC 1971, 31-5-7-15 (Burns Supp. 1975), provides, in pertinent part, as follows:

"If the court shall find that the child comes within the provisions of this act [31-5-7-1—31-5-7-25], it may by order duly entered, proceed as follows:

"(1) Place the child on probation or under supervision in his own home or in the custody of a relative or other fit person, upon such terms as the court may determine;

"(2) Commit the child to any suitable public institution or agency, which shall include, but is not limited to, the state institutions for the feeble-minded, epileptic, insane, or any other hospital or institution for the mentally ill, or commit the child to a suitable private institution or agency incorporated or organized under the laws of the state, and authorized to care for children or to place them in suitable approved homes;

"(3) The court may make such child a ward of the court, a ward of the department of public welfare of the county, or a ward of any licensed child placing agency in the state willing to receive such wardship;

"(4) May take cause under advisement or postpone findings and judgment for a period not to exceed two [2] years unless sooner requested by the party proceeded against in which event not to exceed ninety [90] days.

"(5) Make such further disposition as may be deemed to be to the best interests of the child, except as herein otherwise provided."

IC 1971, 31-5-7-15, *supra,* was recently considered by this court in *In Re Collar et al.* v. *Dept. of Welfare* (1973), 155

Ind. App. 668, 294 N.E.2d 179 (transfer denied), a case similar to the case at bar. In *In Re Collar* the County Welfare Department had filed a petition to have a child made a permanent ward for adoption purposes and, after a hearing on such petition, the trial court so ordered. The appellant asserted in this court that insufficient evidence was introduced in the trial court to support such a disposition of the child. In passing upon such contention, this court examined the provisions of IC 1971, 31-5-7-15 (5), *supra,* and stated:

> "In the instant case the jurisdiction of the child was obtained by the trial court by the petition of the Welfare Department seeking to have the child declared dependent and neglected. Section 9-3207, *supra.* [IC 1971, 31-5-7-7 (Burns Code Ed.)]. The trial court found the child to be a dependent child. At that time the parental rights of the natural mother to control and have custody of the child were terminated by the order of temporary wardship. Having once found the child to be a 'dependent child' the trial court was guided by the best interests of the child. Section 9-3215, *supra.* [IC 1971, 31-5-7-15 (Burns Supp. 1975)]." *Ibid.* at 671 of 155 Ind. App., at 182 of 294 N.E.2d.

The appellants have not attempted to distinguish *In Re Collar* on this point. The foregoing rationale from such case and its implicit approval of the procedure utilized by the trial court in the case at bar is reaffirmed. Such holdings are dispositive of this issue.

Appellants next contend that the proceeding in the trial court was constitutionally defective in that the petition here at issue failed to adequately impart notice that the proceeding in the trial court concerned the termination of their parental rights. However, it must be remembered that the petition here at issue alleged that the children were dependent and neglected and sought an order making them "wards of the County Department of Public Welfare for all purposes including adoption." Such petition further alleged that the best interests of the children would be served if they "were removed from the care, custody and control of their said parents so that said children could be placed in suitable homes for adoption."

The issue, then, is whether such statements constituted notice that the petition sought the termination of the Perkins' parental rights. The Supreme Court of Indiana has said that "[n]otice, giving a defendant [an] opportunity to be informed regarding the nature of the action and reasonable opportunity to make a defense, is an essential element of due process."[1] *State ex rel. Red Dragon Diner* v. *Superior Ct.* (1959), 239 Ind. 384, at 385, 158 N.E.2d at 164, at 165. *See also: Mullane* v. *Central Hanover B. & T. Co.* (1950), 339 U.S. 306, at 314, 70 S.Ct. 652, 94 L.Ed. 865, at 873, wherein the Supreme Court of the United States held that "notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance."

In the case at bar, the petition informed appellants that the County Welfare Department was seeking wardship for "all purposes including adoption." Such language clearly and succinctly reveals that the Welfare Department was seeking authority to place the children up for adoption. Furthermore, it was clearly revealed during the examination of the second witness at trial that such a disposition was sought, and the appellants made no objection and failed to move for a continuance. It must be concluded that appellants have not shown any constitutional infirmity in the notice which they received of the nature of this proceeding.

Appellants next contend that they had inadequate notice of the nature of the proceeding in the trial court because the petition sought a wardship "for all purposes including adoption" or "permanent wardship" rather than a termination of parental rights as found by the trial court. It is readily apparent that appellants' argument on this point is meritorious only if the effects of the termination of their parental rights are different from the effects of a wardship for all purposes

1. Footnote omitted.

including adoption or permanent wardship as requested by the petition. In this regard appellants contend that termination is immediate and irrevocable while a wardship would still allow an opportunity to resist an adoption.

However, as stated hereinabove, the language of the petition clearly indicates an intent to permanently deprive the parents of custody and control of these children. Moreover, a petition seeking the wardship of a child for adoption purposes is, in effect, a petition to eliminate any consent to an adoption by the parents which may ordinarily be required, and to place the Welfare Department in an *in loco parentis* status as to the child. Therefore, since the petition in the case at bar sought to permanently deprive the parents of the custody of these children and requested that the Welfare Department be made *guardian* of the children for adoption purposes, it must be concluded that appellants had notice that the petition sought the termination of their parental rights and that if such petition were granted their consent would not be needed in an adoption proceeding.

Appellants next contend that the trial court erred in holding that sufficient evidence was introduced to warrant a termination of their parental rights. Specifically, the appellants contend that the trial court erred by applying incorrect standards for the termination of their parental rights, and that there is no evidence supportive of the trial court's holding that Joseph and Marvin, Jr. were dependent children as defined in IC 1971, 31-5-7-5 (Burns Code Ed.).

IC 1971, 31-3-1-7, *supra,* which prescribes the procedures and conditions for both the voluntary and involuntary termination of parental rights in Indiana provides,[2] in pertinent part:

"(c) All rights of a parent with reference to a child, including right to control or consent to an adoption, may be terminated by order of a court having jurisdiction to terminate parental rights *on any ground for termination specified in that law.* * * * When the court terminates pa-

2. IC 1971, 31-3-1-7 (Burns Supp. 1975), has been amended since the entry of the judgment in the case at bar. However, such amendment had no effect on the language quoted herein.

rental rights under this chapter [31-3-1-1—31-3-1-12] its paramount concern shall be for the health, welfare and future of the child whose adoption is immediately contemplated or who in the future will hopefully be adopted. The purpose of this chapter in regard to the termination of parental rights is to give to unfortunate children who have been bereft of love and parental care the benefits of a home, and of such parental care, and the law should receive a liberal construction to effect this purpose.

\* \* \* \* \* \*

"(f)   \*   \*   \*

"(1) If the court finds grounds for the termination of the parent-child relationship it shall terminate such relationship. \* \* \*" (Emphasis added.)

In the case at bar, the jurisdiction of the trial court to terminate the parental rights of the appellants arose from a provision of our juvenile laws. Because IC 1971, 31-3-1-7 (c), *supra,* requires a trial court to involuntarily terminate parental rights only upon the grounds specified in the statute conferring jurisdiction upon such court to terminate such rights, it is necessary to consider the grounds required for such disposition under IC 1971, 31-5-7-15, *supra,* the juvenile dispositional statute relied upon by the trial court.

Such statute permits a juvenile court to make any "disposition as may be deemed to be the best interests of the child," except as otherwise provided therein. We have heretofore held that such language permits a juvenile court to terminate parental rights.

However, such a disposition should not be made lightly. The possibility of the termination of parental rights injects an additional consideration into a juvenile court proceeding. The juvenile court's primary concern in ordering a disposition of a dependent or neglected child is in securing for the child "such care, guidance and control, \* \* \* as will serve the child's welfare and best interests of the state." IC 1971, 31-5-7-1 (Burns Code Ed.). However, when the court also contemplates the termination of parental rights, it must also consider the parents' interest in the custody of the child. The

nature of this interest was described by this court in *In Re Adoption of Bryant* v. *Kurtz, et al.* (1963), 134 Ind. App. 480, at 486-87, 189 N.E.2d 593, at 597, as follows:

"However, since the relationship between parent and child is a bundle of human rights of such fundamental importance, it has generally been held that adoption statutes being in derogation of the common law should be strictly construed in favor of a *worthy parent* and the preservation of such relationship. *Therefore the rules in the above paragraph need be tempered by the rule that neither should the statute be so liberally construed that it would destroy safeguards erected for preservation of family relationships.*

"On the question of parent and child relationship we quote with appropriate pertinency from *Duckworth* v. *Duckworth* (1932), 203 Ind. 276, [at 281-82], 179 N.E. 773, [at 774-75]:

' "Of the many ties that bind humanity, that which unites the parent and the child is the earliest and the most hallowed . . . and in all civilized countries it is regarded as sacred." [Orr v. State (1919), 70 Ind. App. 242, at 254, 123 N.E. 470.] Therefore, "parents have the natural right to the custody of their children," and "where one parent is dead, the surviving parent, if fit, has the right to the custody." ' [46 C.J., *Parent and Child,* § 9, at 1223, 1224.]"
(Footnotes omitted.)

The United States Supreme Court has similarly considered the importance of this relationship, and in *Stanley* v. *Illinois* (1972), 405 U.S. 645, at 651, 92 S.Ct. 1208, at 1212-13, 31 L.E.2d 551, stated:

"The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), 'basic civil rights of man,' Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942), and '[r]ights far more precious . . . than property rights,' May v. Anderson, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88

L.Ed. 645 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment. Meyer v. Nebraska, *supra*, 262 U.S. at 399, 43 S.Ct. at 626, the Equal Protection Clause of the Fourteenth Amendment, Skinner v. Oklahoma, *supra*, 316 U.S. at 541, 62 S.Ct., at 1113, and the Ninth Amendment, Griswold v. Connecticut, 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L.E.2d 510 (1965) (Goldberg, J., concurring)."

In addition, proceedings for the termination of parental rights have more serious consequences than those involving a change of custody of a child. If a child is found to be dependent or neglected within the meaning of the appropriate juvenile statutes and custody is awarded to an individual or entity other than the parent(s), such deprivation of parental custody and control may temporarily alter the personal relationships between child and parent, but it does not affect any of the legal rights and responsibilities between the parent and child. A termination of parental rights, however, "divest[s] the parent and the child of all legal rights, privileges, duties and obligations, including rights of inheritance, with respect to each other." IC 1971, 31-3-1-7(g), *supra*.

However, because IC 1971, 31-5-7-15, *supra,* requires that any disposition thereunder be in the best interests of the child, the foregoing parental interests must be subordinated to the child's interest in determining an appropriate disposition of any petition to terminate such parental rights. This view is in conformity with the general rules applicable in child custody proceedings. *See, Sanders* v. *Sanders* (1974), 160 Ind. App. 174, 310 N.E.2d 905.

It is in this context that this court must determine the standards to be employed by a juvenile court in determining whether the best interests of a child would be served by a termination of his parents' rights without their consent. It is apparent from the foregoing discussion that such standards should recognize the societal interest in maintaining and protecting the rights and interests of the

parent in the child, and those of the child in the parent. Further, such natural rights and interests should not be terminated, absent parental acts or omissions sufficiently harmful to the child that it would be more in the best interests of the child to terminate the rights of his parent(s) than to allow such relationship to continue. It is our view that these goals are best served by a requirement that a termination of parental rights following a finding of dependency or neglect by a juvenile court be made only where the evidence discloses a protracted history of dependency or neglect by the parent(s) as defined by statute, a substantial probability of such deprivation of the child in the future, and that it is not reasonably probable that it will serve the future welfare of the child to continue such child's legal relationship with the parent(s).

This procedure provides a number of safeguards for proceedings contemplating the termination of parental rights. First, it requires the court to find not only that the child is a dependent or neglected child, but also requires an examination of the past history of the parent-child relationship to determine whether such dependency or neglect has been habitual or long-standing. Further, in recognition of the permanent effect of termination, it requires the court to evaluate the parents' habitual patterns of conduct to determine whether there is a substantial probability of a future deprivation of the child. Finally. it recognizes the effect of termination on the rights of the child by requiring that evidence be presented showing that it is not foreseeable that the child's welfare would be served by a continuation of the parent-child relationship. Thus, such a procedure affords adequate consideration of the interests of both the parents and the child, while assuring that the court acts in the best interests of the child as required by statute.

A review of the evidence most favorable to the appellee as set forth hereinabove establishes that Marvin, Jr. and Joseph were dependent children as defined by statute from March 14, 1969, until the time of trial. During such period Marvin, Sr.

failed to provide for their support even though he had the financial ability to do so by reason of his monthly Army retirement pay and his earnings or workmen's compensation payments, and was under a court order to do so. The record further discloses that the Perkins had failed to adequately provide for and care for their children since 1966. Additionally, the record establishes that the Perkins were unable or unwilling to care for Marvin, Jr. and Joseph as late as approximately one month prior to trial. It also appears that the Perkins visited Marvin, Jr. and Joseph only infrequently in their foster homes, and had not seen them for some time prior to trial.

Such evidence is sufficient to allow the trial court to find that Marvin, Jr. and Joseph were neglected children as defined by statute in that they were without proper parental care within the meaning of IC 1971, 31-5-7-6(1) (Burns Code Ed.). Such evidence is also sufficient to support inferences by the trial court that the Perkins' children were dependent up to the time of trial through a willful failure of their parents to support them, that such deprivation would likely continue in the future due to its long-standing existence, and that it was not reasonably probable that it would serve the best interests of the children to continue their legal relationship with their parents. A protracted history of such non-support by the Perkins was established by direct evidence. Such evidence and inferences comply with the criteria enunciated hereinabove and establish that the Perkins willfully allowed Marvin, Jr. and Joseph to become and to continue being dependent and neglected children as defined in IC 1971, 31-5-7-5, *supra,* and IC 1971, 31-5-7-6, *supra.* It must be concluded that the trial court correctly held that sufficient evidence was presented to support a termination of the Perkins' parental rights in Marvin, Jr. and Joseph.

The appellants have also made two additional assertions of constitutional error in their brief. Such contentions were not included in the motion to correct errors filed in this case,

and must be deemed to be waived on appeal. *See,* Ind. Rules of Procedure, Trial Rule 59 (G). We note in passing, however, that the appellants are incorrect, insofar as they attempt to predicate a constitutional infirmity in the procedure utilized by the trial court upon the "irrebuttable presumption" doctrine stated in *Stanley* v. *Illinois, supra* (1972), 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. As stated by this court in *In Re Collar et al.* v. *Dept. of Welfare, supra,* at 672 of 155 Ind. App., at 182 of 294 N.E.2d:

> "Once the child is found to be a 'dependent child', and the parental relationship is severed, the change of the state of mind, habits, and circumstances of the parent essential to provide a fit home for the child is a matter solely up to the parent. *The burden of going forward with the evidence* should be, and is, upon the parent to show such a change of conditions and reformation that the best interests of the child would be served by returning the child to the parent." (Emphasis added.)

Unlike the statutory presumption overturned in *Stanley* v. *Illinois, supra,* the procedure approved herein contemplates a full hearing of the parents by the trial court either at the time a child is adjudicated to be "dependent" or at the time at which a termination of their parental rights is under consideration. If the child has been previously adjudicated to be "dependent", the burden of going forward with the evidence shifts to the parents in the termination proceeding as stated in *In Re Collar et al.* v. *Dept. of Welfare, supra.* In either case, the State has the initial burden of proof, and no "presumption" exists.

Appellants' final contentions pertain to the findings made by the trial court. The appellants assert that portions of certain of such findings are clearly erroneous, and urge such defects as a ground for a reversal of this cause. However, even assuming, *arguendo,* that such portions of the findings made by the trial court are erroneous, the decision of the trial court is supported by the remainder of the findings made, and the portions challenged by appellants may be treated as sur-

plusage. Appellants have shown no prejudice warranting a reversal of this cause. *Reg. & Mgt. Corp.* v. *City of Hammond* (1972), 151 Ind. App. 471, 280 N.E.2d 327.

No reversible error having been demonstrated by appellants, the judgment of the trial court must be affirmed.

Affirmed.

Staton, P.J., concurs; Garrard, J., dissents with opinion.

## DISSENTING OPINION

GARRARD, J.—In 1969 our legislature amended the adoption statutes to contemplate a separate proceeding in which the rights of natural parents might be terminated. IC 1971, 31-3-1-7. The relevant portions have been further amended by the Acts of 1971 and 1975.

This proceeding arises under the statute as it existed in 1973. It involves two children previously declared to be dependent or dependent and neglected children. At the time the questioned proceeding was instituted, they had been under foster care for more than five years. In July 1973, the welfare department petitioned to have the children made permanent wards for all purposes, including adoption. The trial court found this to be a petition to terminate the parental rights of the natural parents and, after hearing, granted the petition. The principal question is whether it had the authority to do so. The essence of the problem is the statutory authority granted by the legislature and what is meant by "terminating parental rights." To me, the phrase does not have a well-defined meaning when its various applications under the law are considered. There appear to be potentially two types of uncertainty.

The first is whether "terminate" means permanently or merely temporarily. Historically, when an adoption is decreed, the termination of the rights of the natural parent is "permanent." However, the termination of present rights to custody, etc. which may result from delinquency, dependency or neglect proceedings has historically been considered as not permanent.

*See,* IC 1971, 31-5-7-17, which expressly recognizes the continuing ability to rehabilitate the family unit.

The second question concerns *which* parental rights are in issue. One apparent grouping consists of the present right to the custody, control, etc. of the child. Another concerns the right of inheritance and the right of support which flow between parent and child. Our traditional concepts of adoption have generated yet a third category of parental rights: the right to consent (or withhold consent) to an adoption.

The significance of the question dealt with by the legislature is fundamental. On the one hand, we have consistently recognized the importance of the family, not only as one of the essential units of personal liberty and freedom but as the necessary cornerstone for a viable society. If attributes such as love, duty, honor, and morality are not fostered in the home, they are unlikely to be acquired at the hands of government through any system of schools or courts. Our juvenile code was therefore established upon the premise that where possible, an ailing family should be cured rather than have its members amputated.

On the other hand, where these values are non-existent in the home, or even negative, where do a child's interests lie and what is the proper concern of society? I do not dispute the generalization that institutions, and even foster care, fail to provide an adequate substitute. I also recognize that our ability to successfully find adoptive homes for children may decline in proportion to their increasing ages; as may the ability of such a home to have basic impact on the child.

It appears to be the broad purpose of the legislature to promote the finding of adoptive homes for unfortunate children who are denied proper parental care. The statutory device employed is apparently intended to permit a proceeding with notice and opportunity to be heard. If proper grounds are established, the right of natural parents to resume control of their children and to withhold consent to an adoption of the children are to be terminated.

This approach appears to be reasonable. In addition to the primary effect of dispensing with lack-of-consent issues in adoption proceedings at a time when the familial relationship between the child and the would-be adoptive parents has been encouraged and oftentimes established, there may be secondary effects. Prospective families might be much encouraged to consider making a home for a particular child if it appeared at the onset that the child could be adopted and its natural parents would not be able to effectively withhold consent. Once initiated, the relationship between the child and the prospective family could benefit from a unity unhampered by continuing appeals or contacts from a natural parent.

These goals appear worthy and within the province of the legislative branch. That, however, is not the question confronting this court. Moreover, it must be remembered that the legislature is attempting to provide for the exception, not the rule. The rule remains the essential value of the right-duty relationship between natural parent and child.

As a final precursor to a decision, I do not believe appellate courts must shy away from implementing a legislative enactment merely because the court must judicially fill in "interstitial spaces" or even engage in substantial judicial interpretation to effect the legislative purpose. Properly courts can, and should, so interpret statutes in terms of the use and demands of society where they can do so *within* the approach of law-reason.[1] This qualification, although perhaps incapable of any precise definition, provides a restraint upon statutory construction that is both real and proper.

The question at hand is whether the enacted provisions providing for the termination of parental rights are sufficiently explicit that they may be enforced against the appellants. In view of the substantial impact of the answer and the fact that

---

1. *See*, Leflar, *Statutory Construction: The Sound Law Approach*, remarks, Federal Judicial Center, Washington, D.C., May 13, 1975.

this is a case of first impression, I feel compelled to state the dissent to the view taken by the majority.

Considering that present rights to custody and control have been terminable under the juvenile laws since about 1907, but that parental rights in general have been historically terminated only upon a grant of adoption, it seems clear that the "termination" of parental rights referred to in Sections 6 and 7[2] of the amendments to the adoption statute connotes permanence. If it did not, nothing would be gained by such a proceeding because the parent could again seek a determination of his, or her, right to withhold consent when a petition for adoption was filed.

This follows because Section 6 provides the general rule that no court can grant an adoption unless the natural parents, if living, consent.[3] (The provisions of Section 6 and 7 are set out in the margin.)[4] This section, in subparagraph (g), states the exceptions by providing:

2. IC 1971, 31-3-1-6, 7.
3. The exception regarding fathers of illegitimate children is not relevant here and no discussion regarding it is necessary.
4. "31-3-1-6 [3-120]. Consent of parent or parents—Abandoned or deserted child—Child over fourteen—Parents deprived of parental rights —Notice.—(a) Except as otherwise provided in this section, a petition to adopt a minor may be granted only if written consent to adoption has been executed by:
(1) each living parent of a legitimate minor child;
(2) the mother of an illegitimate minor child and the father of such child whose paternity has been established by a court proceeding and who has contributed to the support or care of such child and whose home or work address is known or can be found without expenditure exceeding five dollars [$5.00];
(3) any person, agency or county department of public welfare having lawful custody of the minor;
(4) the court having jurisdiction of the custody of the minor, if the legal guardian or custodian of the person of the minor is not empowered to consent to the adoption;
(5) the minor to be adopted, if more than fourteen [14] years of age; or
(6) the spouse of the minor to be adopted.
A minor parent may consent to an adoption without the concurrence of his parent or parents, or the guardian of his person, unless the court, in the exercise of its discretion, determines that it is in the best interest of the child to be adopted to require such a concurrence.
(b) The consent to adoption may be executed at any time after the birth of the child either in the presence of the court, in the presence

of a notary public, or other person authorized to take acknowledgments, or in the presence of a duly authorized agent of the state or county department of public welfare or licensed child-placing agency.

(c) A consent which does not name or otherwise identify the adopting parent is valid if the consent contains a statement by the person whose consent it is, that the person consenting, voluntarily executed the consent without disclosure of the name or other identification of the adopting parent.

(d) The state department of public welfare is hereby authorized to furnish to the clerks of courts prescribed forms for use by parents or other persons when giving consent.

(e) Copies of such consent when signed shall be filed with the investigating agency aforesaid and with the clerk of the court in which the petition for adoption is pending. Such court shall cause notice of hearing and oportunity to file objection to be given to such interested parties as the court in its discretion may direct.

(f) A consent to adoption cannot be withdrawn after the entry of the decree of adoption. A consent to adoption may not be withdrawn prior to the entry of the decree of adoption unless the court finds, after notice and opportunity to be heard afforded to the petitioner, the person seeking the withdrawal is acting in the best interest of the person sought to be adopted and the court orders the withdrawal.

(g) Consent to adoption is not required of:

(1) a parent or parents if the child is adjudged to have been abandoned or deserted for six [6] months or more immediately preceding the date of the filing of the petition; or a parent of a child in the custody of another person, if for a period of at least one [1] year he fails without justifiable cause, to communicate significantly with the child when able to do so or he wilfully fails to provide for the care and support of the child when able to do so as required by law or judicial decree;

(2) the natural father of an illegitimate minor child;

(3) a parent who has relinquished his right to consent as provided in IC 1971, 31-3-1-6;

(4) a parent whose parental rights have been terminated by order of court as provided under IC 1971, 31-3-1-7 or by order of court having jurisdiction to terminate parental rights on any ground for termination specified by other law;

(5) a parent judicially declared incompetent or mentally defective if the judge dispenses with the parent's consent;

(6) any legal guardian or lawful custodian of the person to be adopted other than a parent who has failed to respond in writing to a request for consent for a period of sixty [60] days or who, after examination of his written reasons for withholding consent, is found by the court to be unreasonably withholding his consent.

(h) Notice of hearing on a petition for adoption need not be given to a person whose consent has been filed with the petition or to a person whose consent is not required by subsection (g)(2), (g)(3) or (g)(4) of this section, except that in the case of the natural father of an illegitimate minor child, where the paternity of such child has been established by law and the father is adequately supporting such child, or where for any reason in the discretion of the court it is deemed advisable that he be heard, he shall have such notice as the court deems necessary and opportunity to file his objection if any, and oppose such adoption, which objection shall be considered and determined by the court.

(i) Where the parental rights have been terminated as provided in IC 1971, 31-3-1-7 notice of the pendency of such adoption proceedings shall be given to the agency or county department of public welfare of which the child is a ward.

31-3-1-7 [3-120a]. Termination of parental rights—Minor parents—Power of court.—(a) The rights of a parent including an adjudicated or adoptive parent with reference to a child, including parental right to control or consent to an adoption, may be relinquished or terminated in or prior to an adoption proceeding as provided in this section.

(b) All rights of a parent with reference to a child, including parental right to control or consent to an adoption or to receive notice of a hearing on a petition for adoption, may be relinquished and transferred to a licensed child-placing agency or county department of public welfare, by a writing (1) signed by the parent in the presence of a representative of an agency or county department to whom custody of the child is transferred and in the presence of a notary public or other person authorized to take acknowledgments; or (2) signed by the parent in the presence and with the approval of a judge of a court of record of the jurisdiction within or without this state in which the minor is present or in which the parent resided at the time it is signed.

A minor parent may relinquish and transfer his parental rights as provided herein, without the concurrence of his parent or parents, or the guardian of his person, unless the court, in the exercise of its discretion, determines that it is in the best interest of the child to be adopted to require such a concurrence.

The state department of public welfare is hereby authorized to furnish the clerk of courts prescribed forms for use in such relinquishment of parental rights. Such form shall include a provision naming the licensed child-placing agency or county department of public welfare to whom the rights of the parent with reference to the child shall be transferred.

(c) All rights of a parent with reference to a child, including right to control or consent to an adoption, may be terminated by order of a court having jurisdiction to terminate parental rights on any ground for termination specified in that law. In addition, all rights of a parent with reference to a child, including right to control or consent to an adoption, may be terminated by the court having jurisdiction over adoption proceedings under this chapter issued on any ground provided by law for termination of parental rights. When the court terminates parental rights under this chapter [31-3-1-1—31-3-1-12] its paramount concern shall be for the health, welfare and future of the child whose adoption is immediately contemplated or who in the future will hopefully be adopted. The purpose of this chapter in regard to the termination of parental rights is to give to unfortunate children who have been bereft of love and parental care the benefits of a home, and of such parental care, and the law should receive a liberal construction to effect this purpose.

(d) For purposes of proceedings under this chapter [31-3-1-1—31-3-1-12], a decree terminating all rights of a parent with reference to a child, including parental right to control or consent to an adoption, entered by a court of competent jurisdiction in this or any other state is sufficient to dispense with the consent of a parent whose rights are terminated by the decree and with any required notice of an adoption proceeding other than as provided in this section.

(e) A petition for termination of parental rights made in connection with or before an adoption proceeding may be filed by the following:

(1) either parent when termination of a parent-child relationship is sought with respect to the other parent, or

(2) the guardian of the person, the legal custodian, or the person standing in parental relationship to the child, or

(3) a licensed child-placement agency or county department of public welfare, or

(4) any other person having a legitimate interest in the matter.

The petition shall be filed before adoption proceedings are instituted, unless the court in its discretion, allows a petition to be filed during the adoption proceedings. When the petition is filed the adoption of the minor child need not be immediately contemplated, and the purpose of the petition may be to facilitate adoption when adoptive opportunities arise.

After a petition has been filed, the court shall require notice of the hearing to be given to the petitioner, the parents of the child, the guardian of the person of the child, the person having legal custody of the child, and, in the discretion of the court, a person appointed to represent any party.

(f) Every order of the court terminating the parent-child relationship or transferring legal custody or guardianship of the person of the child or providing for protective supervision of the child under this chapter [31-3-1-1—31-3-1-12] shall be in writing and shall recite the findings upon which such order is based, including findings pertaining to the court's jurisdiction. Such order shall be conclusive and binding on all persons from the date of entry.

(1) If the court finds grounds for the termination of the parent-child relationship it shall terminate such relationship and: (A) appoint an individual as guardian of the child's person, or (B) appoint an individual as guardian of the child's person and vest legal custody in another individual or in an authorized agency, or (C) where it is alleged in the petition that the termination is in contemplation of adoption, appoint an official of an authorized agency as guardian of the child's person and vest legal custody in such agency.

The court shall also make an order fixing responsibility for the child's support. The parent-child relationship may be terminated with respect to one [1] parent without affecting the relationship between the child and the other parent.

(2) Where the court does not order termination of the parent-child relationship, it shall dismiss the petition: Provided, however, That where the court finds that the best interest of the child requires substitution or supplementation of parental care and supervision it shall make an order placing the child under protective supervision, or vesting temporary legal custody in an authorized agency and fixing responsibility for temporary child support, and may certify the case to an appropriate court for further action as may be necesary: Provided further, That the court, if it has not certified the case to another court, shall periodically review its temporary child custody order for the purpose of permanently terminating parental rights or restoring complete custody in the person temporarily divested of control or custody of the child.

(g) An order terminating the parent-child relationship shall divest the parent and the child of all legal rights, privileges, duties and obligations, including rights of inheritance, with respect to each other.

(h) As used herein, 'guardianship of the person' with respect to a minor includes, when the parent-child relationship has been terminated by judicial decree with respect to the parents, or only living parent, or where there is no living parent, the authority to consent to the adoption of the child and to make any other decision concerning the child which the child's parents could make."

"(g) Consent to adoption is not required of:

(1) a parent or parents if the child is adjudged to have been abandoned or deserted for six [6] months or more immediately preceding the date of the filing of the petition; or a parent of a child in the custody of another person, if for a period of at least one [1] year he fails without justifiable cause, to communicate significantly with the child when able to do so or he wilfully fails to provide for the care and support of the child when able to do so as required by law or judicial decree;

\* \* \*

(4) a parent whose parental rights have been terminated by order of court as provided under IC 1971, 31-3-1-7 or by order of court having jurisdiction to terminate parental rights on any ground for termination specified by other law;"

Section 7 consists of eight subparagraphs. Subsection (a) provides that the rights of a parent "including parental right to control or consent to a adoption" may be relinquished, or terminated as provided in Section 7. Subsection (b) provides for a voluntary relinquishment. Subsection (c) provides for termination of "all rights . . . including right to control or consent to an adoption" by court order in either of two instances. The first is by a court "having jurisdiction to terminate parental rights on any ground for termination specified in *that* law." The alternative is termination by the court having adoption jurisdiction "on any ground provided by law for termination of parental rights."

The subsection further provides that the court's paramount concern shall be for the health, welfare and future of the child, and the law should be given liberal construction to effect its social purpose of benefitting unfortunate children.

Subsection (d) provides that for purposes of adoption proceedings, "a decree terminating all rights of a parent with reference to a child, including parental right to control or consent to an adoption" if entered by a court of competent jurisdiction, dispenses with the necessity of that parent consenting to an adoption.

Subsection (e) provides when a petition to terminate may be filed in connection with an adoption proceeding and who may file it. It also provides for notice.

Subsection (f) then provides, "Every order of the court *terminating* the *parent-child relationship*," or transferring custody or guardianship shall be in writing and shall recite the court's findings. The subsection further provides, "If the court finds grounds for termination of the parent-child relationship, *it shall terminate* such relationship."

Finally, subsection (g) specifies that an order terminating the *parent-child relationship* shall divest the parent and the child of "all legal rights, privileges, duties and obligations, incuding rights of inheritance."

Are the grounds to terminate the "parent-child relationship" different from those to terminate "the rights of a parent, including parental right to control or consent to an adoption?" Are these terminations the same thing?

In either event, what are the "grounds?" Aside from the reference to consideration for the health, welfare and future of the child, the statute is silent. From bowsprit to rudder, Section 7 contains no express mention of any substantive ground upon which the court, or parents and children, may by any objective standard gauge when "rights" shall be terminated and when they shall not.[5]

The statute, however, also provides for termination by a court "having jurisdiction to terminate parental rights on any ground for termination *specified* in *that* law." Do the dependency and neglect provisions in the juvenile law meet this definition?

Clearly these provisions do contemplate terminating a parent's *present* right to custody and control. They do provide

---

5. One may also express curiosity regarding the status of a child whose "parent-child relationship" has been terminated where no adoption proceedings ever materialize. Although his right of inheritance from his natural parents may be largely academic, what of his standing as an otherwise potential heir-at-law of his natural parents' relatives?

a substantive basis for decision, and in practice they can have the effect of permanency by withholding custody and control for the duration of the child's minority. In recognition of these attributes and in accord with the concern voiced in Section 7(c) for the health, welfare and future of the child, the majority has held the juvenile statute sufficient to permit termination of the right to withhold consent to an adoption where the dependency or neglect has a protracted history, and it appears substantially probable that the condition will continue and the future welfare of the child will not be served by continuing the relationship with the natural parents.

While this is a reasonable basis for applying the dependency and neglect statute under Section 7, it begs the question.

To sustain the authority (the jurisdiction) of the trial court to make the termination it made in this case, it seems to me that only two courses are open.

The first would be to interpret the provision of Section 7(c) stating that rights may be terminated "by order of a court having jurisdiction to terminate parental rights on any ground for termination specified in that law" as simply recognizing that other statutes may also deal with permanently terminating parental rights. The difficulty with this interpretation as applied to the present juvenile code is that nothing in the provisions relating to dependency or neglect expressly empowers the court to terminate a parent's right to consent to adoption, much less the entire parent-child relationship.[6] I am unwilling to now imply this power to a juvenile court on the basis of the "make such further disposition" language contained in IC 1971, 31-5-7-15(5). The precise language of the statute limits its application to the other provisions of the act. These include IC 1971, 31-5-7-17, which recognizes the continuing opportunity to rehabilitate the family.

6. Arguably under this interpretation the impact of the termination of the entire parent-child relationship could be restricted to proceedings brought "directly" under the adoption court alternative.

The second alternative is to interpret the "other law" jurisdiction recognized in Section 7(a) as simply vesting jurisdiction to conduct a Section 7 termination upon any court that has jurisdiction to presently terminate or suspend any kind of parental rights. However, under this view, the court would be governed by the provisions of Section 7 for the substance and procedure to effect a permanent termination of all rights. It appears to me that the fatal defect in accepting this interpretation for the case at hand is the total failure of Section 7 to specify any substantive grounds for determining when permanent termination is appropriate.[7]

It must therefore be concluded that IC 1971, 31-3-1-7, as it existed in 1973, is vague and ambiguous; that it does not vest the juvenile court with the power to permanently terminate all rights of the parents of dependent or neglected children, and that the juvenile court has no such power pursuant to IC 1971, 31-5-7-15. *See, Railroad Comm'n.* v. *Grand Trunk, etc. Ry.* (1913), 179 Ind. 255, 100 N.E. 852; *Cook* v. *State* (1901), 26 Ind. App. 278, 59 N.E. 489. *See, also, Shupe* v. *Bell* (1957), 127 Ind. App. 292, 141 N.E.2d 351, stating that dependency and neglect statutes should be strictly construed.

Accordingly, that portion of the judgment purporting to

---

7. The 1975 amendments do little to solve the problem. Section 7 was amended to specify that at the hearing on a petition to terminate, the petitioner shall show that reasonable services were offered to the parents to aid in overcoming the problems which originally led to deprivation of physical custody. IC 1971, 31-3-1-7(e). Furthermore, although Section 6(g)(7) and (8) now specifically refers to certain neglected or dependent children, it does so merely in terms of *dispensing with consent* to adoption and not to otherwise terminating parental rights. Query: What is the effect of these sections which dispense with consent in the case of cruelly treated or neglected children or judicially declared dependent children whose parents suffer a disability from the use of alcohol or controlled substances? In each category, one of the statutory requirements is the condition that the parents have been deprived of physical custody for at least two (2) years *prior* to the filing of a petition for the termination of parental rights. If parental rights have been terminated under Section 7, what is the significance of subsections (7) and (8), especially in view of subsection (4), which purports to dispense with consent wherever parental rights have been terminated under Section 7?

permanently terminate parental rights, including the right to consent to adoption, should be vacated.

NOTE.—Reported at 352 N.E.2d 502.